Christopher M. Von Maack (10468)
  vonmaack@mvmlegal.com
Eric K. Schnibbe (8463)
  schnibbe@mvmlegal.com
Craig M. Hansen (18202)
  hansen@mvmlegal.com
MᴄNᴇɪʟʟ | Vᴏɴ Mᴀᴀᴄᴋ
236 South 300 East
Salt Lake City, Utah 84111
Telephone: 801.823.6464

Robert E. Linkin (*pro hac vice forthcoming*)
  rlinkin@munckwilson.com
Tri T. Truong (*pro hac vice forthcoming*)
  ttruong@munckwilson.com
Mᴜɴᴄᴋ Wɪʟsᴏɴ Mᴀɴᴅᴀʟᴀ, LLP
807 Las Cimas Parkway, Suite 300
Austin, Texas 78756
Telephone: 737.201.1600

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **KARTHIKA MANDYAM, ZAC SCHERRMAN, SEAN DONE, DAVID GRILLO, TYLER SADEK, REGINALD FRANKLIN, DAVID SCHROEDER, TOM ANDERSON, PRAVIN THAKKAR, KMANDY INVESTMENTS, LLC, DRIFTLESS WATER VENTURES LLC, ADVENTURE DONE RIGHT, LLC, ROSEWATER VENTURES, LLC, FOUNDERS MOSAIC PARTNERS, LLC, AR WATER SUPPLY, LLC, INDIANA WATER TECHNOLOGY, LLC, SPRUCE WATERS INVESTMENTS, LLC, ROSE TRAIL VENTURES, LLC, AND ROSE TRAIL VENTURES 2, LLC,**<br><br>    **Plaintiffs,**<br><br>**v.**<br><br>**CELTIC BANK CORPORATION, CELTIC INVESTMENT, INC., AND SCOTT FOSTER,**<br><br>    **Defendants.** | **COMPLAINT**<br><br>**JURY DEMANDED**<br><br><br><br>**Case No. 2:25-cv-00732** |

Plaintiffs Karthika Mandyam, Zac Scherrman, Sean Done, David Grillo, Tyler Sadek,

Reginald Franklin, David Schroeder, Tom Anderson, Pravin Thakkar (collectively, the individual

Plaintiffs are referred to as "Guarantors"), Kmandy Investments, LLC, Driftless Water Ventures LLC, Adventure Done Right, LLC, Rosewater Ventures, LLC, Founders Mosaic Partners, LLC, AR Water Supply, LLC, Indiana Water Technology, LLC, Spruce Waters Investments, LLC, Rose Trail Ventures, LLC, and Rose Trail Ventures 2, LLC (collectively, the entity Plaintiffs are referred to as "Borrowers"; "Guarantors" and "Borrowers" together are referred to as "Plaintiffs") file this Original Complaint ("Complaint") against Defendants Celtic Bank Corporation ("Celtic Bank"), Celtic Investment, Inc. ("Celtic Investment"), and Scott Foster ("Foster") (collectively, "Defendants") for damages and declaratory and injunctive relief, respectfully stating as follows:

## I.    <u>INTRODUCTION</u>

This case is about financial havoc created by Defendant Celtic Bank— which abdicated its responsibility as a prudent lender and instead became an active participant in a "franchise opportunity" Ponzi scheme. In late 2024, news rippled across the internet about the collapse and bankruptcy of Celtic Bank's co-conspirator WaterStation. Celtic Bank fueled WaterStation's operations by extending loans to innocent investors under the guise of the Small Business Administration's ("SBA") flagship 7(a) program, purportedly to finance the purchase of WaterStation franchises. Even as the scheme crumbled, Celtic Bank accrued massive profits through administration fees, interest payments, outstanding debts, and collateralized assets (among other financial gains). On top of the windfall obtained by inducing Plaintiffs to borrow money to invest in WaterStation, Celtic Bank enabled its senior officer—Scott Foster—to leverage his personal investments in WaterStation by processing Plaintiffs' loans which they knew did not qualify for SBA loans.

Ordinarily, a normal and prudent lender adheres to industry practices and SBA regulations and guidelines, verifies the existence and location of collateral, and discloses conflicts of interest. Celtic Bank did none of these things. Instead, Celtic Bank, among other things:

- Failed to examine or verify the existence or location of the primary collateral securing Plaintiffs' SBA loans. Celtic Bank knew or should have known the vast majority of the primary collateral being purchased with the loan proceeds were either double and triple pledged or did not exist at all. Although Celtic Bank was armed with investor and product information, it failed to warn or disclose as much to Plaintiffs. Instead, Celtic Bank disbursed SBA loan proceeds directly to WaterStation without confirming whether such funds were used for authorized purposes. And because these loans were guaranteed by the SBA, Plaintiffs were required to pledge their homes and real estate as secondary collateral, while Celtic Bank relied on the federal government's guarantees.

- Failed to follow SBA regulations and guidelines regarding lending practices under the 7(a) loan program, including, but not limited to "passive" (not permitted) versus "active" (permitted) business, choosing instead to deceive innocent victims like Plaintiffs into obtaining SBA loans with knowledge that they were not eligible for such loans.

- Failed to disclose the conflicts of interest created by Scott Foster, senior officer and control person of Celtic Bank as its Senior VP and head of SBA Lending, who not only was a franchisee, but demanded payments from WaterStation, and who, upon information and belief, recouped his entire investment in the WaterStation franchise, as he funneled additional victim funds into the scheme by continuing to process more and more SBA loans—thereby funding his own "returns" at the expense of others.

As a result of Celtic Bank's actions, Plaintiffs all stand on the precipice of, or have already experienced, financial disaster. But rather than accepting responsibility, Celtic Bank has instead doubled down, seeking to foreclose on the homes and property of Plaintiffs— in some cases, their primary residences. Plaintiffs bring this lawsuit to hold Celtic Bank accountable for its knowing participation in the Ponzi scheme that took advantage of the SBA lending structure and taxpayer funds under 7(a) loan program and defrauded unsuspecting victims, including Plaintiffs, of millions of dollars. Without any other recourse, Plaintiffs seek this Court's assistance in putting an end to Celtic Bank's unconscionable and unlawful conduct.

## II.     PARTIES

1.      Plaintiff Karthika Mandyam is an individual residing in McKinney, Texas.

2.      Plaintiff Reginald Franklin is an individual residing in Spring, Texas.

3.      Plaintiff Zac Scherrman is an individual residing in Dubuque, Iowa.

4.      Plaintiff Sean Done is an individual residing in Salt Lake City, Utah.

5.      Plaintiff David Grillo is an individual residing in West Hollywood, California.

6.      Plaintiff Tyler Sadek is an individual residing in Indianapolis, Indiana.

7.      Plaintiff David Schroeder is an individual also residing in Indianapolis, Indiana.

8.      Plaintiff Tom Anderson is an individual residing in Naples, Florida.

9.      Plaintiff Pravin Thakkar is an individual residing in Memphis, Tennessee.

10.     Plaintiff Kmandy Investments, LLC is a Texas limited liability company with its principal place of business in McKinney, Texas and Karthika Mandyam is its owner.

11.     Plaintiff Driftless Water Ventures LLC is an Iowa limited liability company with its principal place of business in Dubuque, Iowa and Zac Scherrman is its owner.

12.     Plaintiff Adventure Done Right, LLC is a Utah limited liability company with its principal place of business in Salt Lake City, Utah and Sean Done is its owner.

13.     Plaintiff Rosewater Ventures, LLC is a California limited liability company with its principal place of business in West Hollywood, California, and David Grillo is its owner.

14.     Plaintiff Founders Mosaic Partners, LLC is an Indiana limited liability company with its principal place of business in Indianapolis, Indiana, and Tyler Sadek is its owner.

15.     Plaintiff AR Water Supply, LLC was a Texas limited liability company with its principal place of business in Spring, Texas and Reginald Franklin is its owner.

16.     Plaintiff Indiana Water Technology, LLC is an Indiana limited liability company with its principal place of business in Indianapolis, Indiana and David Schroeder is its owner.

17.     Plaintiff Spruce Waters Investments, LLC was an Illinois limited liability company later converted into a Florida limited liability company with its principal place of business in Naples, Florida, and Tom Anderson is its owner.

18.     Plaintiffs Rose Trail Ventures, LLC, and Rose Trail Ventures 2, LLC are Tennessee limited liability companies with their principal place of business in Memphis, Tennessee, and Pravin Thakkar is their owner.

19.     Defendant Celtic Bank is a Utah state-chartered industrial bank headquartered in Salt Lake City, Utah. Celtic Bank is one of the largest SBA lenders in the United States and is designated as a "preferred lender" or "PLP" by the SBA.

20.     Upon information and belief, Defendant Celtic Investment is an Illinois Corporation and the parent company of Celtic Bank. Upon information and belief, Celtic

Investment is headquartered in Salt Lake City, Utah. Through its subsidiary, Celtic Bank, Celtic Investment conducts substantial business in this jurisdiction.

21.     Upon information and belief, Defendant Scott Foster is an individual residing in Salt Lake City, Utah. Foster joined Celtic Bank—with over 20 years of experience in the banking industry, including 14 years in SBA lending—as Senior Vice President of Business Development in Celtic Bank's SBA Lending Department. Foster at all times relevant was an employee, officer, agent, and representative of Celtic Bank.

### III.    RELATED NON-PARTIES

22.     Creative Technology, LLC d/b/a Water Station Technology ("WST") is a Washington limited liability company with its former principal place of business in Everett, Washington. WTS was purportedly in the business of building and selling water vending machines. In truth, WST and its affiliates were nothing more than a Ponzi scheme.

23.     Water Station Management, LLC ("WSM") is a Washington limited liability company with its principal place of business in Everett, Washington. WSM was an affiliate of WST and purported to be in the business of servicing and managing the water vending machines sold by WST. Although the WaterStation entities are not currently listed as inactive, they have ceased their business operations and are the subject of two bankruptcy proceedings and numerous lawsuits across the country.

24.     WST Franchise Systems LLC ("WFS") (WFS, WSM, and WST together are referred to as "WaterStation") was a Washington limited liability company with its principal place of business in Everett, Washington. WFS (a holding company), together with WSM and WST, sold franchise opportunities to investors. WFS was administratively dissolved on or about July 3, 2025.

6

25.     Ryan Wear ("Wear") is an individual, who upon information and belief, resides in Everett, Washington. Wear founded WaterStation and oversaw its business operations and activities. Wear reportedly owned interests in some 25 other businesses entities through which he laundered and stole hundreds of millions of dollars.

26.     Various other financial institutions, including First Fed Bank and Unibank, were also active participants in the Ponzi scheme and similarly utilized either commercial loans or the SBA's 7(a) loan program to help further the scheme.

## IV.    JURISDICTION AND VENUE

27.     This Court has jurisdiction and supplemental jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367. Plaintiffs' claims arise, in part, under federal law, specifically the federal civil racketeering laws (18 U.S.C. § 1964), and alternatively, § 10(b) of the Securities Exchange Act (15 U.S.C. §§ 78j(b), 78aa). Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1)–(2), 18 U.S.C. § 1965, and 15 U.S.C. § 77b because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and Defendants reside, do business, have an agent, transact business, and/or maintain a principal place of business in this jurisdiction.

28.     This Court has personal jurisdiction over Defendants. Defendants have engaged in continuous, regular, and systematic relations with this jurisdiction, including underwriting and processing SBA loan applications and issuing loans in this jurisdiction. For example, Defendants are headquartered in Salt Lake City, Utah and issued loans to a Utah resident Plaintiff. The assertion of personal jurisdiction over Defendants will not offend traditional notions of fairness and substantial justice under Constitutional due process principles.

## V.    <u>FACTUAL BACKGROUND</u>

### A.    The WaterStation Ponzi Scheme.

#### 1.    The WaterStation operation.

29.     Ryan Wear through his now defunct business entities, WST, WSM, and WFS, purported to manufacture, sell, operate, and service self-serve water vending machines which he claimed to be located in stores and offices across the country.

30.     WaterStation originally sold its water vending machines and services as a "business opportunity" to investors. Later, Wear transitioned to a franchise model. Notwithstanding the nomenclature, Wear operated a Ponzi scheme through WaterStation that fleeced its victims and others out of hundreds of millions of dollars with the participation of financial institutions like Celtic Bank. As a result, franchisees such as Plaintiffs have been left in financial ruin, having lost millions of dollars in direct payments, incurring millions of dollars in debt owed to Celtic Bank, and facing foreclosures of their residences and/or real property by Celtic Bank.

31.     In 2017, WaterStation began offering franchise opportunities through which franchisees could purchase and earn revenue from WaterStation's water vending machines. WaterStation and Wear promised franchisees they would receive revenue payments in the form of royalties generated by sales made at the water vending machines in exchange for WaterStation retaining a share of the profits. For many of the franchisees—including Plaintiffs—these revenue payments were necessary to cover the cost of owning the water vending machines—which primarily consisted of the monthly payments incurred by franchisees to service the debt they incurred to pay for the water vending machines.

32.     The basic structure of this franchise arrangement involved a water vending machine purchase coupled with a service contract, under which WaterStation (through WSM) was responsible for the placement, maintenance, and management of the machines at retail locations nationwide, as well as processing any payments. Franchisees were encouraged to purchase large numbers of water vending machines, each of which cost approximately $8,500.

33.     WaterStation promised significant returns on the franchisees' WaterStation opportunity and told franchisees they could sell their machines back to WaterStation and exit the opportunity should they desire to do so. Specifically, WaterStation told potential franchisees that the machines would generate returns of 12 to 20 percent and assured them they would receive a "guaranteed" buyback of their machines should they become dissatisfied with the opportunity in the future, thereby mitigating the risk of the franchise opportunity and improving returns.

### 2.     WaterStation's partnership with lenders.

34.     A critical component of WaterStation's marketing of the franchise opportunity was its frequent touting of its relationship with specified banks and that it was an "SBA approved" franchise. The advantage of structuring the WaterStation investment opportunity as a purported franchise was that WaterStation and certain partner lenders could exploit the SBA's 7(a) program lending structure and each lender's status as a preferred lender under the SBA's PLP to bypass SBA's eligibility restrictions and compliance requirements. To achieve SBA's PLP designation, banks must undergo a rigorous review process to verify their adherence to SBA requirements and guidelines, as PLP lenders are authorized to review and approve applications and issue 7(a) loans without first obtaining SBA approval. In other words, under the PLP, the SBA delegated its authority to and relies on PLP lenders to conduct requisite diligence and ensure strict criteria are

met with respect to 7(a) loans and to verify loan proceeds (which are guaranteed by the SBA) are distributed only for approved purposes.

35.    WaterStation and the SBA PLP-participating banks capitalized on this feature of the SBA 7(a) program to lend money to innocent franchisees.

36.    Each of those financial institutions (including Celtic Bank), rather than complying with industry practices and/or SBA obligations, instead became an active participant in the WaterStation scheme.[1]

### 3.    WaterStation is unmasked as a fraud.

37.    Ultimately, in 2024, WaterStation was unmasked as nothing more than a rank fraud.

38.    Most of the water station units "sold" by WaterStation did not exist or were not placed at the claimed locations. Instead, WaterStation and Wear are believed to have pocketed the money spent by franchisees for what turned out to be nonexistent or duplicate units and diverted the money either for other purposes, and/or to cover payments or redemption obligations to earlier franchisees, *i.e.*, WaterStation was simply a Ponzi scheme.

39.    Unlike Celtic Bank, which had the serial numbers and locations for each machine WaterStation was purporting to sell to Plaintiffs, each Plaintiff <u>only</u> had access to identifying

---

[1] For example, one such partner lender, First Fed Bank allegedly encouraged and solicited franchisees, saddling them with debt, while failing to disclose it had loaned WaterStation $30,000,000 and was seeking to funnel funds into the scheme in order to protect its position as a creditor of WaterStation. Ultimately, First Fed Bank's CEO was forced to resign on July 14, 2025 as a likely result of First Fed Bank's involvement. Likewise, in another lawsuit, Unibank, a Washington-based SBA lender, was also implicated in the WaterStation scheme, with its role described as rife with conflicts of interest. Unibank personnel allegedly had close personal ties to WaterStation personnel. Unibank personnel even invested in WaterStation themselves, ultimately receiving a full return of their funds. These facts allegedly were never disclosed.

information for their own machines. Thus, banks such as Celtic and WaterStation exclusively held the information which would have potentially unmasked the scheme.

40.     For example, WaterStation identified each of the water vending machines it purported to sell through the use of serial numbers. Those numbers (and their corresponding locations) were provided to each of the partner lenders. The water vending machines WaterStation purported to sell, however, were frequently identified through duplicate serial numbers or not found at their claimed locations.

41.     According to the Washington State Department of Financial Institutions ("DFI"), of the nearly 15,000 machines purchased by franchisees (amounting to approximately $120,000,000 in sales) just over 6,000 actually existed.

42.     By late summer 2024, Chapter 11 bankruptcy proceedings were commenced against the WaterStation entities and their affiliates in the Bankruptcy Courts for the Southern District of Texas and Eastern District of Washington.

43.     Only a few months ago, the DFI filed a Statement of Charges against WaterStation and its affiliates, alleging they offered and sold unregistered securities in the form of a passive franchise arrangement.

44.     And, on August 14, 2025, the United States Attorney's Office for the Southern District of New York announced the unsealing of an indictment, charging Wear with securities and wire fraud in connection with the WaterStation scheme.

45.     Following the exposure of the WaterStation scheme, numerous lawsuits have been filed against WaterStation and Wear. Virtually every lawsuit has noted the conspicuous

11

participation of WaterStation's partner lenders in the scheme with Fintech Business Weekly noting the "stunning" SBA 7(a) fraud may be the "largest in the [SBA]'s history."[2]

**B.    Celtic Bank's Insider Role in Processing Borrowers' SBA Loans.**

**1.    Celtic directly financed purchases of WaterStation franchises.**

46.    Plaintiffs' exposure to WaterStation was directly tied to the active involvement of Celtic Bank in the WaterStation scheme.

47.    Plaintiffs were each introduced in variety of manners to the WaterStation franchise opportunity and learned about or were persuaded to purchase the WaterStation franchise opportunity from a variety of sources.

48.    At various times in 2020, 2021, and 2022, Plaintiffs each were introduced (and routed) to Celtic Bank by WaterStation, who assured each Plaintiff that Celtic Bank would arrange SBA financing for the franchise opportunity under the SBA's 7(a) loan program.

49.    Notably, in connection with the SBA financing process, each Plaintiff worked directly with Foster, who served as a senior officer of Celtic Bank and its Senior Vice President of Business Development in charge of Celtic Bank's SBA Lending Department until his termination in January 2025. In his capacity as the head of Celtic Bank's SBA Lending Department, Foster was the decision maker responsible for and controlled Celtic Bank's SBA lending business.

50.    During this process, Foster and Plaintiffs discussed the franchise opportunity, with Foster at times encouraging Plaintiffs to purchase additional water vending machines and to increase the amount of capital they would deploy in the WaterStation franchise opportunity.

---

[2] Jason Mikula, *Stunning SBA 7(a) Fraud May be Largest in Agency's History. Why Isn't Anyone Talking About It?* FINTECH BUS. WEEKLY, Aug. 3, 2025, https://fintechbusinessweekly.substack.com/p/stunning-sba7a-fraud-may-be-largest.

51.     At around the same time, Celtic Bank interacted directly with WaterStation. Celtic Bank was provided with WaterStation's financial, contractual, and/or product documents for Celtic Bank's review and underwriting purposes and directly discussed or had the opportunity to discuss these topics with WaterStation.

52.     In total, from June 2020 to October 2022, Celtic Bank provided over $17 million in financing for Plaintiffs to purchase their WaterStation franchises through the SBA 7(a) loan program.

53.     In some cases, Celtic wired both the loan proceeds and Plaintiffs' cash down payments directly to WaterStation.

### 2.     Celtic Bank's senior officer's dealings with WaterStation.

54.     Among the many things Celtic Bank failed to disclose to Plaintiffs was that at least as early as 2021, Foster and his wife *Jenny*fer Foster (hence their company's name) were also large investors in a WaterStation franchise through a company they owned, i.e., YNNEJ, LLC.

55.     Upon information and belief, Foster and his wife invested nearly $2 million in their own franchise—an amount which came from an SBA-backed loan they obtained from another lender and which would lead Foster and Celtic Bank to put their own interests before those of Plaintiffs.

56.     For example, Foster and his wife entered into a separately negotiated service arrangement with WaterStation which provided Foster with higher levels of revenue from his WaterStation franchise than was typically paid to other franchisees, such as Plaintiffs.

57.     Additionally, as early as 2021 and no later than March 2022, Foster had begun to question Wear about WaterStation's failure to make timely payments of revenue owed to him and

his wife. In fact, in text messages, Foster repeatedly questioned Wear about WaterStation's inability to pay royalties and meet its other payment obligations.

58.     Neither Celtic Bank nor Foster ever conveyed these concerns or experiences with WaterStation to any of the Plaintiffs as Celtic Bank continued to accept loan payments and/or Foster continued to encourage them to borrow more and more money so that more funds could be directed into the WaterStation scheme and pay out earlier investors such as Foster.

59.     Foster went so far as to demand repayment of his entire investment in his franchise—which on information and belief, was paid to Foster and his wife (and/or their company) before the collapse of the scheme—another fact never disclosed to Plaintiffs.

60.     Despite his undisclosed ties and dealings with Wear and WaterStation, Foster actively promoted the WaterStation franchise opportunity to Plaintiffs and encouraged them to borrow millions of dollars from Celtic Bank, while simultaneously demanding payments from Wear and WaterStation which were presumably funded by the very same debt Celtic Bank and Foster caused Plaintiffs to incur.

61.     And all of Foster's actions with respect to Plaintiffs were done in his capacity as a senior officer and Senior Vice President of and control person at Celtic Bank and thus done with Celtic Bank's knowledge, consent, and/or acquiescence.

### C.     Celtic Bank's Fraudulent Loans.

62.     Celtic Bank's wrongful conduct with respect to Plaintiffs was not limited to Foster's dealing with Wear and/or WaterStation.

63.    Between June 2020 and October 2022, Celtic Bank approved nearly $17.5 million in SBA loans for each of the Plaintiffs, in amounts between $382,500 and $2,946,800 per loan, for the purchase of WaterStation franchises.

64.    For each loan, Celtic Bank charged applicants between approximately $2,500 and $10,000 for packaging fees, collateral review and documentation fees, and/or appraisal fees per borrower.

65.    And the funds borrowed by Plaintiffs from Celtic Bank were never forwarded to Plaintiffs, but rather were wired directly to Wear and/or his companies in 2020, 2021, and 2022.

66.    As of August 2025, Borrowers' loans with Celtic Bank have a balance of nearly $14 million. Borrowers have paid in excess of $3.7 million in principal and $2.8 million in interest to Celtic Bank on the SBA-guaranteed loans. A summary of Borrowers' approximate loan amounts and investments in WaterStation is reflected in the table below:

| Borrower | Loan Approval Date | Loan Amount | Interest | Loan Balance | WaterStation Investment |
|---|---|---|---|---|---|
| Rosewater Ventures, LLC | 6/19/2020 | $2,774,000 | $631,008.20 | $2,128,989.80 | $3,000,000 |
| Founders Mosaic Partners, LLC | 9/1/2020 | $2,491,300 | $540,016 | $1,881,334 | $4,182,000 |
| Rose Trail Ventures, LLC and Rose Trail Ventures 2, LLC | 12/10/2020 11/26/2021 | $4,620,100 | $854,104.32 | $4,406,378.52 | $4,998,000 |
| Spruce Waters Investment, LLC | 9/14/2020 | $919,200 | $110,473.48 | $283,677.39 | $994,500 |

| | | | | | |
|---|---|---|---|---|---|
| Indiana Water Technology, LLC | 9/15/2020 | $1,855,100 | | $1,400,000 | $3,323,500 |
| A&R Water Supply, LLC | 8/11/2021 | $2,946,800 | $385,000 | $2,520,484 | $3,272,500 |
| Adventure Done Right, LLC | 8/24/2021 | $382,500 | $70,157.33 | $312,258.12 | $425,000 |
| Kmandy Investments, LLC | 1/5/2022 | $586,700 | $122,044 | $491,205.82 | $637,500 |
| Driftless Water Ventures LLC | 10/20/2022 | $900,000 | $100,980.60 | $439,729.41 | $994,550 |
| **Total** | | **$17,475,700** | **$2,813,783.93** | **$13,864,057.06** | **$21,827,550** |

67.     As part of the SBA 7(a) program, each individual Plaintiff was required to sign an unconditional guarantee, making them personally responsible for payment of the notes in the event Borrowers defaulted.

68.     Moreover, each Plaintiff was required to pledge as secondary collateral for the loan, their personal real estate holdings—which in some cases meant their primary residences.

### 1.     Celtic Bank's role went beyond the lender-borrower relationship.

69.     Celtic Bank touts its extensive experience in processing and making SBA loans to customers across the country.

70.     Celtic Bank's President proudly boasts it "provides financing to a broad range of small businesses on a nationwide basis" and is "a top SBA lender."[3] When he joined Celtic Bank,

---

[3] Celtic Bank's Submission to FDIC *re: Parent Companies of Industrial Banks and Industrial Loan Companies (RIN 3064–AF88)*, https://www.fdic.gov/federal-register-publications/celtic-bank-and-celtic-investment-inc-todd-boren-and-reese-howell-jr.

Foster remarked he was "excited" by the opportunity to bring his "SBA expertise" to Celtic Bank and combine his "talents" with "an aggressive national lender that serves the small business owner with lending solutions that fit their business growth needs[.]"[4]

71.     Celtic Bank's dedicated webpage on SBA 7(a) loans similarly says: "On top of affordable terms, when you buy a business with a top-five Preferred SBA lender like Celtic Bank, your loan application is approved in-house instead of being sent to the SBA for approval. This accelerates your time to funding."[5]

72.     According to the SBA's 7(a) and 504 Lender Report, Celtic Bank approved, across various types of 7(a) loans, 513 loans in 2020 for over $530 million, 490 loans in 2021 for over $720 million, and 707 loans in 2022 for over $640 million.[6]

73.     Celtic Bank's unique role under the SBA's 7(a) lending framework and relationship with Plaintiffs for the SBA loans for the WaterStation franchise investment was different from a conventional lender-borrower transaction.

74.     Moreover, Celtic Bank's involvement with these investment transactions went beyond the domain of the usual money lender and instead transitioned into providing specific guidance as to the intricacies of the SBA lending process and quality and nature of their franchises. For example:

---

[4] Casey Shaw, *Scott Foster Joins Celtic Bank as Senior Vice President, Business Development of SBA Lending*, CELTIC BANK, Mar. 22, 2018, https://www.celticbank.com/releases/scott-foster-joins-celtic-bank-as-senior-vice-president-business-development-of-sba-lending.

[5] Finance a Business Acquisition, *Buy a Business with a Top-Five SBA Preferred Lender*, CELTIC BANK, https://www.celticbank.com/business-acquisition.

[6] *7(a) & 504 Lender Report*, U.S. SMALL BUS. ADMIN., https://careports.sba.gov/views/7a504LenderReport/LenderReport?%3Aembed=y&%3AisGuestRedirectFromVizportal=y.

a. Foster touted the financial opportunity the WaterStation franchise presented to Plaintiffs. Specifically, Foster told Plaintiffs the WaterStation franchise was a great investment and that he had processed many loans for WaterStation. Foster also boasted he was great at the SBA program and directed Plaintiffs to just follow his lead.

b. Foster devised a strategy to encourage some Plaintiffs to purchase additional water station units and increase their investment financing with Celtic Bank by counseling those Plaintiffs to make a 10 percent down payment instead of 30 percent on their loan terms.

c. Foster directed Plaintiffs to let him answer questions in their communications with Celtic Bank's underwriting.

d. Foster reassured Plaintiffs regarding their concerns about investment risks and potential defaults by telling Plaintiffs there were mitigating steps to safeguard their collateralized properties.

75.     Even more so, because of Celtic Bank's inherent self-interest in each Plaintiff's franchise relationship with WaterStation by virtue of Foster's relationship and dealings with WaterStation and Wear, Celtic Bank encouraged each Plaintiff to invest in WaterStation and take on tremendous debt from Celtic Bank to do so.

76.     Significantly, because of Foster's connection to WaterStation and his role as a senior officer of Celtic Bank and decision maker who controlled and directed the processing and approval of Borrowers' loans, Celtic Bank endorsed and approved WaterStation as a legitimate and sound commercial investment.

77.     Unlike ordinary business loans, SBA-guaranteed loans are governed by stringent federal requirements regarding who qualify for the loans and for what purposes loan proceeds can be used. The SBA requires the use of specific forms related to SBA loan applications. And, as "a top-five SBA preferred lender with delegated lending authority from the SBA[,]" Celtic Bank could expedite the lending process by approving loans in house.[7] Indeed, Celtic Bank emphasizes: "whether this is your first time buying a business, or are a seasoned business owner looking to expand—partner with a lender that makes buying a business smooth, simple, and affordable."[8]

78.     Thus, Plaintiffs relied on:

        a.  Celtic Bank's expertise, knowledge, and advice as to whether their WaterStation franchise investments were eligible for an SBA loan.

        b.  Celtic Bank's expertise, knowledge, and assistance to ensure that they or their business entities were eligible for an SBA loan.

        c.  Celtic Bank's expertise, knowledge, and assistance to ensure that all forms were properly completed as required by SBA regulations and guidelines.

79.     Under SBA's delegated authority, Celtic Bank knew, for each Borrower's SBA loan, the SBA would not review eligibility. And, in connection with each Borrower's SBA loan, Celtic Bank certified and/or represented to the SBA, among other things:

        a.  That the loan proceeds would be used for an eligible purpose.

---

[7] Business and Equipment Loans for Breweries, *Buy, Build or Expand Your Brewery*, CELTIC BANK, https://www.celticbank.com/brewery.

[8] *See supra*, note 6.

    b.   That neither Celtic Bank nor its associates have a real or apparent conflict of interest with Plaintiffs.

    c.   The loan applicant was eligible for SBA guarantees.

**2.    Celtic Bank deceived Plaintiffs into obtaining SBA loans they did not qualify for.**

80.    The SBA requires, *inter alia*, lenders like Celtic Bank to determine and certify each applicant and/or its investment is qualified for SBA loans.

81.    In fact, one SBA lender declined a loan request from a WaterStation investor due to eligibility concerns.[9] Despite that, before, at, or around the approval and/or closing of each Borrower's loan, Celtic Bank falsely represented to Plaintiffs they were qualified for SBA loans and certified to the SBA that Plaintiffs' WaterStation franchises were eligible for SBA loans. Among other things, Celtic Bank also misrepresented:

---

[9] Celtic Bank's improper lending practices here appear to be part of a long-term practice at Celtic Bank. In a May 27, 2021 letter sent to Celtic CEO and Chairman of the Board Reese Howell, Jr. by House of Representatives Select Subcommittee on the Coronavirus Crisis Chairman James E. Clyburn, the committee noted that, "[i]n one notable prosecution, Celtic Bank issued a PPP loan to an individual in Texas that was rejected by another lender weeks earlier."

Chairman Clyburn further noted: "According to an analysis of PPP fraud cases by POGO, support by a review of active DOJ prosecutions, Celtic Bank was involved in nearly 30 percent of the approved loans issued by FinTechs or their bank partners that were subject to DOJ prosecutions."

For the cited examples, Mr. Clyburn remarked, among other things, "[t]here is no indication that either Celtic Bank or its FinTech Partner noted inconsistencies in the provided documents, flagged the application for fraud review, or asked additional questions of the applicant[,]" "[n]either Celtic Bank, nor its FinTech partners, identified these clear indicators of fraud[,]" and "[t]here is no indication that Celtic Bank performed any due diligence before issuing the PPP loan."

*See* May 27, 2021, Letter from Chairman James E. Clyburn to Reese Howell, Jr., CONGRESS OF THE UNITED STATES, HOUSE OF REPRESENTATIVES, SELECT SUBCOMMITTEE ON THE CORONAVIRUS CRISIS,https://coronavirus-democrats-oversight.house.gov/sites/evo-subsites/coronavirus-democrats-oversight.house.gov/files/2021-05-27.Clyburn%20to%20Celtic%20Bank%20re%20FinTech%20PPP%20Fraud.pdf.

    a.  That the loan proceeds would be used to purchase WaterStation's machines—machines Plaintiffs would own and that would secure their investments and collateralize their loans.

    b.  That there were steps to protect Plaintiffs' collateralized vending machines.

    c.  That the WaterStation franchise was a great investment opportunity.

82.    Additionally, before (and after) approving their loans and investments in WaterStation, Celtic Bank did not disclose at least the following:

    a.  Foster's relationship and dealings with WaterStation and/or Wear, or the conflict of interest this posed.

    b.  Foster would be paid more than other franchisees according to the service arrangement between him and WaterStation and/or Wear, or the conflict of interest this posed.

    c.  With every loan to Borrowers, it was enabling WaterStation and/or Wear to pay out Foster's franchise interest in WaterStation, or the conflict of interest this posed.

    d.  Foster's knowledge of WaterStation's precarious financial condition or its failure to perform or timely repay Foster, or the conflict of interest this posed.

    e.  In the event of insolvency, Foster would have competing claims with Plaintiffs by virtue of Foster's investment in WaterStation, or the conflict of interest this posed.

f.   Before or after issuing loans to Plaintiffs that it knew or should have known WaterStation and/or Wear could not repay.

g.   WaterStation machine lists included significant duplication of serial numbers and addresses, indicating Wear was, at minimum, selling the same machines to different investors.

h.   It had not verified the existence (and/or locations) of the machines Wear and/or WaterStation claimed to have owned or to be selling.

i.   Whether Wear's and/or WaterStation's activities ever triggered fraud alerts or other compliance concerns at Celtic Bank.

83.     Celtic Bank made misrepresentations and/or omissions that misled Plaintiffs about their qualifications for the loans as well as the quality, safety, and propriety of the investment transactions. Celtic Bank also made false representations and/or omissions to Plaintiffs and the SBA about the nature/eligibility of the franchisees and whether their loans were compliant with SBA's 7(a) program.

84.     Celtic Bank engaged in self-serving, misleading, and deceptive conduct to the detriment of Plaintiffs, while violating standard lending practices and SBA regulations and guidelines. Celtic Bank willingly issued fraudulent loans to unsuspecting franchisees like Plaintiffs and transferred the funds (including, in some cases, the Plaintiffs cash down payments) directly to WaterStation without confirming that proceeds were actually used to purchase the machines collateralized the loans. By doing so, Celtic Bank knowingly participated in and substantially contributed to and enabled the WaterStation scheme.

**D.      Celtic Bank and Foster Benefitted from the Scheme.**

85.    Celtic Bank was willing to turn a blind eye to WaterStation's misconduct so long as it was reaping the financial gains and benefitting from WaterStation's misappropriation of investor funds.

86.    Celtic Bank benefited from the WaterStation scheme in at least the following ways: (a) it received a substantial amount of money in terms of fees, interest (that at times resulted in monthly payments exceeding borrower salaries), and government-backed debts, as well as other profits from each loan repayment plan; (b) it received additional business as a result of its participation in the fraudulent scheme; and (c) the SBA loans were collateralized by Plaintiffs' real properties, among other things, which insulated Celtic Bank from loss while subjecting Plaintiffs to complete financial ruin. Similarly, Foster received a payout for his franchise interest using proceeds of the fraudulent scheme—an outcome that was nearly impossible for most investors.

**E.      Celtic Bank Threatens to Foreclose on Plaintiffs' Properties.**

87.    Plaintiffs made substantial payments on their fraudulently induced loans. Despite its facilitation of and culpability and participation in the WaterStation scheme, Celtic Bank has improperly retained possession of Plaintiffs' payments, while refusing to take responsibility for its own actions and seeking to enforce the fraudulent loans against Plaintiffs, including demanding payment and threatening legal action and the potential loss in some cases of their family homes. To gain a tactical advantage and exert pressure, Celtic Bank also commenced foreclosure proceedings against certain individual Plaintiffs in a calculated effort to cause even further financial harm to Plaintiffs and drain them of the resources required to bring litigation so that Celtic might be brought to heel.

88.    Faced with this misfortune, Plaintiffs (Borrowers and Guarantors) seek the Court's assistance to resolve the matter in a fair and equitable manner.

## RICO ALLEGATIONS

### A.    Culpable Person(s)

89.    Each Defendant (or unnamed member of the Enterprise described below) is "capable of holding a legal or beneficial interest in property," and therefore is a "person" within the meaning of 18 U.S.C. §1961(3).

### B.    The WaterStation Enterprise

90.    The WaterStation Enterprise is an association-in-fact enterprise which consists of Wear, WST, WSM, WFS, Celtic Bank, UniBank, First Fed Bank, Foster and other individuals and institutions used to conduct the activities of the WaterStation Enterprise ("Enterprise" or "WaterStation Enterprise").

91.    Wear, WST, WSM, WFS, Celtic Bank, Unibank, First Fed Bank, Foster and others knowingly and continuously directed and/or participated in the WaterStation Enterprise's scheme to commit fraud by stealing money from franchisees through a complicated web of financial arrangements and practices which left the members of the WaterStation Enterprise enriched, while leaving each of the franchisees, including Plaintiffs, financially ruined. Wear, WST, WSM, WFS, Celtic Bank, Unibank, First Fed Bank, Foster and others, individually and/or collectively, intentionally committed illegal acts through the WaterStation Enterprise for personal gain, including, but not limited to payment in the form of salaries, cash distributions, generous loan fees paid by franchisees, and loan guarantees made by the SBA—which protected participating

financial institutions from the risk of non-payment by the franchisees after the WaterStation Enterprise's scheme collapsed.

92.    The WaterStation Enterprise used Celtic Bank, Unibank, First Fed Bank, and other financial institutions to fund the scheme by advancing loans to each of the franchisees under the guise of the SBA's 7(a) loan program or legitimate commercial loans. Those loans were disbursed directly to the WaterStation Enterprise, which then disbursed funds to various insiders of the scheme.

93.    At the hub of the Enterprise were Wear, WST, WSM, and WFS. They were assisted in the operation of the Waterstation Enterprise by various individuals, including Foster.

94.    The members of the WaterStation Enterprise and their roles with the WaterStation Enterprise are defined below:

    a.    Ryan Wear is at the center of the WaterStation Enterprise. He is the founder and owner of WST, WSM, and WFS, as well as the person in charge of the Enterprise. Wear agreed to participate in the WaterStation Enterprise and contributed to the activities of the WaterStation Enterprise in at least the following ways: establishing WST, WSM, and WFS, designing and implementing WaterStation's franchise system, selling and marketing the water vending machines and franchise system, establishing relationships with SBA lenders and other financial institutions for purposes of funding the WaterStation Enterprise.

    b.    WST is one of the entities through which Wear operated the WaterStation Enterprise. WST agreed to participate in the WaterStation Enterprise and

contributed to its activities in at least the following ways: manufacturing, selling and marketing water vending machines and the franchise system and collecting and distributing funds collected for purposes of distribution to members of the WaterStation Enterprise.

c.  WSM is also one of the entities through which Wear operated the WaterStation Enterprise. WSM agreed to participate in the WaterStation Enterprise and contributed to the activities of the WaterStation Enterprise in at least the following ways: controlling the purported placement, management and maintenance of the water vending machines sold to franchisees through a service arrangement and collection of revenue and funds for distribution to members of the WaterStation Enterprise.

d.  WFS is another affiliated entity through which Wear operated the WaterStation Enterprise. WFS agreed to participate in the WaterStation Enterprise and contributed to the activities of the WaterStation Enterprise in at least the following ways: creating and owning a system for developing and operating the WaterStation machines; licensing such system and related trademarks and trade names to franchisees for the purposes of funding; and collecting and distributing funds collected for purposes of distribution to members of the WaterStation Enterprise.

e.  Celtic Bank agreed to participate in the WaterStation Enterprise and contributed to the activities of the WaterStation Enterprise in at least the following ways: soliciting and processing loans through the SBA's 7(a) loan

26

program for franchisees; fraudulently structuring loans in a manner which would guarantee approval for franchisees through the SBA 7(a) loan program, and directly wiring funds from such loans to WaterStation for purposes of distribution to members of the WaterStation Enterprise.

f.  Unibank agreed to participate in the WaterStation Enterprise and contributed to the activities of the WaterStation Enterprise in at least the following ways: soliciting and processing loans through the SBA's 7(a) loan program for franchisees; fraudulently structuring loans in a manner which would guarantee approval for franchisees through the SBA 7(a) loan program, and directly wiring funds from such loans to WaterStation for purposes of distribution to members of the WaterStation Enterprise.

g.  First Fed Bank agreed to participate in the WaterStation Enterprise and contributed to the activities of the WaterStation Enterprise in at least the following ways: soliciting and processing commercial loans for franchisees, directly wiring funds from such loans to WaterStation, and directly lending money to WaterStation for purposes of distribution to members of the WaterStation Enterprise.

h.  Scott Foster agreed to participate in the WaterStation Enterprise and contributed to the activities of the WaterStation Enterprise in at least the following ways: as Celtic's Senior VP of SBA Lending, Foster solicited, encouraged, and processed franchisee loans through the SBA's 7(a) loan program, as a means of funneling cash from Celtic Bank directly into the

WaterStation Enterprise for purposes of distribution of such cash to members of the WaterStation Enterprise.

i. On information and belief, the WaterStation Enterprise also consisted of other unknown entities and Jane and John Doe participants likely to be uncovered through discovery.

**C.    The WaterStation Enterprise's Pattern of Racketeering**

95.    Beginning in or around 2017, the WaterStation Enterprise's scheme began with the acquisition of water dispensary machines by victims from WaterStation coupled with a service agreement as part of a purported legitimate franchise arrangement. Wear operated and oversaw WaterStation's operations and activities until WaterStation was forced into bankruptcy in late 2024. From around 2017 to at least the end of 2022, WaterStation partnered with various lenders, including Celtic Bank, Unibank, and First Fed Bank to raise capital for WaterStation Enterprise's operations. Specifically, WaterStation routed the potential franchisees to the select lenders so they could obtain commercial loans or small business loans under the SBA's 7(a) loan program. For SBA PLP lenders, they were able to expedite the SBA loan underwriting and approval process without first obtaining SBA approval. Nationwide, over 170 investors spent nearly $130 million on the WaterStation franchise opportunity. Considering this volume, the WaterStation Enterprise executed considerable (likely, hundreds if not thousands of) wire and/or mail communications within a ten-year period to send, among other things:

a. Marketing materials, franchise agreements, service agreements, investment pitches and materials to franchisees;

    b.   Loan related documents, including loan term sheets, commitment letters, loan related applications, loan agreements, guaranty agreements, lender agreements, loan authorizations, security agreements; and

    c.   Wire transfers of loan proceeds and payments.

**D.    The WaterStation Enterprise Uses Celtic Bank to Fund the Enterprise**

96.    To fund the WaterStation franchise purchases, the WaterStation Enterprise relied on financial institutions, including Celtic Bank, Unibank, and First Fed Bank to originate and disburse commercial or SBA 7(a) loans. The banks (including the SBA preferred lenders) served as critical gateways for the Enterprise, giving the appearance of legitimate loan transactions, facilitating borrower approvals, and wiring money directly to WaterStation, while bypassing qualification requirements and collateral verification and shifting repayment risk to the SBA. The WaterStation Enterprise's use of Celtic Bank and other PLP lenders further lent credence to Wear's promotion that the investments were SBA-approved.

**E.    The WaterStation Enterprise's Predicate Acts Directed at Plaintiffs**

97.    At least from June 2020 to October 2022, Celtic Bank knowingly conducted and/or participated, directly or indirectly, in the conduct of the WaterStation Enterprise's affairs through a pattern of racketeering activity.

98.    As set forth herein, Celtic Bank, sent, or caused a member or employee of a member of the WaterStation Enterprise to send letters, notices, agreements, and other written correspondence by mail and/or e-mail to Plaintiffs. Those documents included false representations and/or omissions intended to induce Plaintiffs to secure SBA loans to purchase

WaterStation franchises and/or conceal the nature or purpose of the WaterStation Enterprise's scheme.

99.     Additionally, Celtic Bank wired loan proceeds (and in some cases, Plaintiffs' cash down payments) directly to Wear and/or WaterStation. WaterStation in turn wired monthly payments of Plaintiffs' portions of purported water machine revenues. Furthermore, upon information and belief, Celtic Bank transmitted Plaintiffs' loan documentation to the SBA. Upon information and belief, these wire transfers and electronic communications crossed state lines. These interstate wire transfers and electronic communications were effectuated by Celtic Bank in furtherance of the WaterStation Enterprise's fraudulent scheme alleged herein.

100.     By way of example, the following non-exhaustive list of predicate acts were undertaken intentionally and effectuated by use of a mailing or an interstate wiring, typically email:

        a.    On or about September 22, 2020, Celtic Bank transmitted its representative's electronic signature via DocuSign for SBA Form 1050, titled "Settlement Sheet," in connection an SBA loan for Plaintiff Spruce Waters Investments, LLC, certifying: "The loan proceeds were disbursed and received and will be used in accordance with the Use of Proceeds section of the Authorization[.]" This certification was made in furtherance of the fraudulent scheme because it gave a false impression that the loan proceeds were used for approved purposes. By invoking SBA compliance language to legitimize ineligible SBA loans, Celtic Bank induced borrowers to proceed, while masking any noncompliance, misrepresentations, and/or omissions.

b. On or about July 6, 2021, Celtic Bank transmitted via interstate email an Acknowledgement and Assignment Agreement for Plaintiff Adventure Done Right LLC to sign via DocuSign. Faced with the problem of verifying loan collateral (i.e., the WaterStation machines), this document was sent by Celtic Bank as a workaround allowing Celtic Bank to merely rely on WaterStation's promise to "identify," "locate," and secure "physical possession" of the collateral *in the future* in the event of a default.

c. On or about July 21, 2021, Celtic Bank transmitted via interstate email a commitment letter (indicating, among other things, a third-party site visit would be conducted and the active nature of the franchise) for Plaintiffs Adventure Done Right LLC and Sean Done (along with his wife Anna Done) to sign via DocuSign. This letter was sent to later justify Celtic Bank's actions of submitting a false certification of eligibility to the SBA, thereby allowing Celtic Bank to fraudulently retain Plaintiffs' money.

d. On or about November 1 and 4, 2021, Celtic Bank employee(s) transmitted interstate electronic mails to Plaintiff Karthika Mandyam stating: "I do these projects with 10% down. You can put more money in the project[.]"; "I do a lot of water stations and I do them with 10% all the time[.]" These emails were sent to induce and encourage additional machine purchases and investments in the WaterStation, thereby increasing loan financing through Celtic Bank.

e.   On or about December 7, 2021, Celtic Bank transmitted via interstate email a commitment letter for Plaintiffs Kmandy Investments, LLC and Karthika Mandyam to sign via DocuSign through interstate emails indicating the active nature of the franchise and that acknowledgment and assignment agreement must be signed. This document was sent by Celtic Bank as part of the scheme to allow Celtic Bank to merely rely on WaterStation's promise to identify and locate the collateral *in the future* in the event of a default, and to later justify Celtic Bank's actions of submitting a false certification of eligibility to the SBA, thereby allowing Celtic Bank to fraudulently retain Plaintiffs' money.

f.   On or about October 20, 2022, Celtic Bank transmitted via interstate email a loan authorization to Plaintiff Driftless Water Ventures LLC, indicating the loan guarantee is contingent upon lender "[c]omplying with the current SOP 50 10 and all applicable appendices[.]" This document was sent in furtherance of the fraudulent scheme because it gave false assurance that the loan had been or will be determined to be eligible and compliant with SBA requirements and guidelines. By invoking SBA compliance language to legitimize ineligible SBA loans, Celtic Bank induced borrowers to proceed, while masking any noncompliance, misrepresentations, and/or omissions.

g.   On or about November 3, 2022, Celtic Bank transmitted its representative's electronic signature via DocuSign for SBA Form 1050, titled "Settlement

Sheet," in connection an SBA loan for Plaintiff Driftless Water Ventures LLC, certifying: "The loan proceeds were disbursed and received and will be used in accordance with the Use of Proceeds section of the Authorization[.]" This certification was made in furtherance of the fraudulent scheme because it gave a false impression that the loan proceeds were used for approved purposes. By invoking SBA compliance language to legitimize ineligible SBA loans, Celtic Bank induced borrowers to proceed, while masking any noncompliance, misrepresentations, and/or omissions.

101.    The predicate acts are all related in that each was committed by or at the direction of Celtic Bank or WaterStation or entities controlled by WaterStation and/or Wear, targeting Plaintiffs and other investors, and each predicate act was committed in furtherance of the fraudulent scheme.

102.    These predicate acts stretched continuously and regularly over several years and harmed nearly 170 victims including Plaintiffs. Many investors/SBA loan borrowers like Plaintiffs were deceived by Celtic Bank's fraudulent conduct in connection with the WaterStation franchise and SBA loan transactions.

## VI.    CAUSES OF ACTION

### A.    COUNT I: FRAUD (Against Celtic Bank)

103.    Plaintiffs reallege and incorporate all allegations of this Complaint.

104.    Celtic Bank made false representations and/or nondisclosures through words and/or conduct that were material to Plaintiffs' decision to invest and borrow money.

105.    Among other things, Celtic Bank made the following misrepresentations and/or omissions:

    a.  Celtic Bank failed to disclose Foster's ties and dealings with WaterStation and/or Wear.

    b.  Celtic Bank failed to disclose Foster would be paid more than other franchisees.

    c.  Celtic Bank failed to disclose self-dealings and/or conflicts of interest posed by Foster's history and transactions with Wear and/or WaterStation.

    d.  Celtic Bank failed to disclose it was enabling WaterStation and/or Wear to pay out Foster's franchise interest in WaterStation.

    e.  Celtic Bank failed to disclose Foster's awareness of WaterStation's financial condition or its failure to perform or timely repay Foster.

    f.  Celtic Bank failed to disclose Foster would have competing claims with Borrowers should WaterStation become insolvent.

    g.  Celtic Bank failed to disclose they knew or should have known WaterStation and/or Wear could not repay.

    h.  Celtic Bank failed to disclose they were financing overlapping machines or Wear and/or WaterStation was selling or assigning the same machines to different investors.

    i.  Celtic Bank failed to disclose it had not verified the existence (and/or locations) of the machines.

j. Celtic Bank failed to disclose whether any Wear and/or WaterStation activities triggered fraud alerts or compliance concerns.

k. Celtic Bank failed to disclose the nature of Plaintiffs' investments and their loans were not SBA compliant.

l. Celtic Bank failed to disclose Plaintiffs' investments were not eligible or otherwise qualify for SBA loans.

m. Celtic Bank made false representations about the nature of the investments and whether their loans were SBA compliant.

n. Celtic Bank made false representations that the loan proceeds would be used to purchase the WaterStation machines—machines that turned out to be nonexistent or duplicative.

o. Celtic Bank made false representations that Plaintiffs' investments and/or business entities were eligible or otherwise qualified for SBA's 7(a) loans.

p. Celtic Bank made false representations that Plaintiffs' investments and/or business entities were approved for SBA's 7(a) loans.

q. Celtic Bank made false representations that it would conduct third party site visit.

r. Celtic Bank falsely represented that the WaterStation franchise was a great investment opportunity.

s. Celtic Bank falsely represented there were mitigating factors to protect Plaintiffs' collateralized machines.

t. Celtic Bank falsely represented it would file UCC financing statements for the collateralized vending machines.

106. Celtic Bank's misrepresentations and/or corresponding omissions were material to Plaintiffs in determining whether to engage in the investment and/or loan transactions at issue.

107. The nondisclosed information was known to Celtic Bank, and its representations were false when made. Celtic Bank knew or should have known its representations were false and/or made them recklessly without regard for the truth. Celtic Bank owed a duty to communicate the nondisclosed information.

108. Celtic Bank knew or should have known its representations and/or omissions would induce, and in fact induced, Plaintiffs to act or refrain from acting to their detriment. Plaintiffs reasonably and justifiably relied upon Celtic Bank's statements and omissions in investing in WaterStation and executing the loan transactions.

109. Celtic Bank's misrepresentations and/or omissions proximately caused Plaintiffs' damages in an amount to be proven at trial. Plaintiffs are entitled to legal and equitable remedies without limitation to damages in an amount to be determined at trial.

110. Pursuant to 28 U.S.C. § 2201, Plaintiffs seek declaratory relief from the Court, finding the loan agreements, notes, personal guarantees, pledges of collateral, and other agreements and/or security instruments Plaintiffs were fraudulently induced to sign are void and unenforceable against them, and that all obligations associated with such agreements or instruments are void and unenforceable based on fraud of the lender.

111. Plaintiffs seek injunctive relief against Celtic Bank precluding Celtic Bank from enforcing the subject agreements against them.

**B.    COUNT II: AIDING AND ABETTING FRAUD** (Against Celtic Bank)

112.    Plaintiffs reallege and incorporate all allegations of this Complaint.

113.    Upon information and belief, the WaterStation scheme was aided and abetted by Celtic Bank, who had constructive knowledge and/or were deliberately ignorant and yet substantially assisted Wear and WaterStation's commission of fraud against Plaintiffs.

114.    As a result, Plaintiffs suffered damages. Plaintiffs are entitled to legal and equitable remedies without limitation to damages in an amount to be determined at trial.

115.    Pursuant to 28 U.S.C. § 2201, Plaintiffs seek declaratory relief from the Court finding that the loan agreements, notes, personal guarantees, pledges of collateral, and other agreements and/or security instruments that Plaintiffs were fraudulently induced to sign are void and unenforceable against them, and that all obligations associated with such agreements or instruments are void and unenforceable based on fraud of the lender.

116.    Plaintiffs seek injunctive relief against Celtic Bank precluding Celtic Bank from enforcing the subject agreements against them.

**C.    COUNT III: CONSPIRACY TO DEFRAUD** (Against All Defendants)

117.    Plaintiffs reallege and incorporate all allegations of this Complaint.

118.    Upon information and belief, WaterStation, Wear, Foster, Celtic Bank, and Celtic Investment, or any combination of them, had one or more agreements with a common design to achieve an unlawful purpose or purposes and/or to achieve a lawful purpose or purposes by unlawful means.

119.    WaterStation, Wear, Foster, Celtic Bank, and Celtic Investment, or any combination of them, acted in furtherance of their scheme as alleged herein.

120.    WaterStation, Wear, Foster, Celtic Bank, and Celtic Investment, or any combination of them, by virtue of their agreement(s) and acts in furtherance of the scheme, caused damages to Plaintiffs. Plaintiffs are entitled to legal and equitable remedies without limitation to damages in an amount to be determined at trial.

121.    Pursuant to 28 U.S.C. § 2201, Plaintiffs seek declaratory relief from the Court finding that the loan agreements, notes, personal guarantees, pledges of collateral, and other agreements and/or security instruments that Plaintiffs were fraudulently induced to sign are void and unenforceable against them, and that all obligations associated with such agreements or instruments are void and unenforceable based on fraud of the lender.

122.    Plaintiffs seek injunctive relief against Celtic Bank precluding Celtic Bank from enforcing the subject agreements against them.

### D.    COUNT IV: NEGLIGENCE (Against Celtic Bank)

123.    Plaintiffs reallege and incorporate all allegations of this Complaint.

124.    Celtic Bank provided loans to Plaintiffs to fund their investments in WaterStation for the purchase of the WaterStation franchises.

125.    Celtic Bank achieved SBA's preferred lender designation by undergoing a rigorous SBA review process to ensure adherence to SBA requirements and guidelines. The SBA 7(a) loans provided by Celtic Bank were subject to stringent and specific SBA requirements, which Celtic Bank had specialized knowledge of and which Plaintiffs did not. This relationship is unique, and Celtic Bank, a top-five SBA preferred lender with delegated lending authority from the SBA, owed a duty of reasonable care to its customers like Plaintiffs who were pursuing SBA 7(a) loans. Under SBA delegated authority, Celtic Bank knew and, on information and belief, acknowledged the SBA

would not review loan eligibility prior to approval and instead the SBA would rely upon Celtic Bank to certify that determination.

126.    Celtic Bank, through its interactions with Wear and WaterStation and through its extensive experience as an SBA preferred lender, was aware of SBA lending eligibility requirements and the WaterStation franchise arrangement. Celtic Bank applied its special knowledge and provided advice to Plaintiffs regarding their investments and loan transactions to ensure their loans would be accepted by the SBA. Celtic Bank completed and approved the loans in-house, and then submitted loan paperwork to the SBA further ensuring it would be accepted by the SBA.

127.    Because of this disparity in knowledge, expertise, and skill, and because Celtic Bank provided advice, counseling, and guidance related to risk mitigations, investment strategies, and SBA loan qualification requirements on which Plaintiffs relied to qualify for these government loans, Celtic Bank was in a position of trust, which created a duty of care that Celtic Bank owed to Plaintiffs, in addition to any common law duties.

128.    Celtic Bank further owed a duty of care to Plaintiffs under applicable SBA regulations and guidelines, including to act reasonably and ensure that Plaintiffs' loan applications were compliant with SBA regulations and guidelines.

129.    Celtic Bank breached its duty of care to Plaintiffs, *inter alia*, when it failed to act reasonably and/or engaged in activities that violated applicable SBA regulations and/or guidelines and industry standards, customs, or practices which themselves created a duty of care owed by Celtic Bank.

130.    *For example*, Celtic Bank breached its duty of care to Plaintiffs by:

a. ignoring red flags and obvious signs of fraud and making SBA loans to Plaintiffs for the WaterStation franchise investments.

b. failing to tell Plaintiffs about the red flags and signs of fraud it saw in WaterStation before completing their loans.

c. failing to tell Plaintiffs their proposed investment in the WaterStation franchises would not qualify for an SBA loan.

d. failing to tell Plaintiffs about Foster's dealings with Wear and/or WaterStation.

e. failing to tell Plaintiffs about any potential conflicts of interest posed by Foster's relationship and transactions with Wear and/or WaterStation.

f. failing to confirm loan proceeds were actually used to purchase water vending machines.

g. failing to verify or confirm the existence and/or locations of the collateralized vending machines.

h. engaging in conduct that violated SBA regulations and guidelines.

i. engaging in conduct of self-dealing from which Celtic Bank and Foster derived an improper benefit.

131.    As a direct and proximate result of the breaches of duty by Celtic Bank, Plaintiffs have suffered damages and sustained and incurred substantial losses. Plaintiffs continue to be harmed because loan payments continue to be due to Celtic Bank. Plaintiffs are entitled to all legal and equitable remedies without limitation to damages, including damages for mental anguish and emotional distress.

132.    Pursuant to 28 U.S.C. § 2201, Plaintiffs seek declaratory relief from the Court finding that the loan agreements, notes, personal guarantees, pledges of collateral, and other agreements and/or security instruments that Plaintiffs were negligently induced to sign are void and unenforceable against them, and that all obligations associated with such agreements or instruments are void and unenforceable based on negligence of the lender.

133.    Plaintiffs seek injunctive relief against Celtic Bank precluding Celtic Bank from enforcing the subject agreements against them.

### E.    COUNT V: BREACH OF FIDUCIARY DUTY (Against Celtic Bank)

134.    Plaintiffs reallege and incorporate all allegations of this Complaint.

135.    As alleged herein, Celtic Bank assumed fiduciary, limited fiduciary, and/or other extra-contractual duties to Plaintiffs.

136.    Special circumstances permeated Celtic Bank's relationship with Plaintiffs. Plaintiffs placed trust and confidence in Celtic Bank—a leading SBA preferred lender with delegated lending authority from the SBA—which had superior access to information and superior knowledge and expertise that Plaintiffs relied upon in choosing to invest and obtain an SBA loan.

137.    Because of this disparity in knowledge and skill, and because Celtic Bank provided advice, counseling, and guidance related to risk mitigations, investment strategies, and SBA loan qualification requirements on which Plaintiffs relied to qualify for these government loans, Celtic Bank stood in a fiduciary, limited fiduciary, and/or other heightened relationship with Plaintiffs.

138.    Celtic Bank directly or indirectly participated in or caused the commission of acts, practices, or transactions which constituted, in whole or in part, violation and breach of its duties

to Plaintiffs, including duties arising under common law, SBA regulations and guidelines, and/or industry practices or standards.

139. *For example*, Celtic Bank breached this trust by:

    a. ignoring red flags and obvious signs of fraud and making SBA loans to Plaintiffs for the WaterStation franchise investments;

    b. failing to tell Plaintiffs about the signs of fraud it saw in WaterStation before completing their loans;

    c. failing to tell Plaintiffs their proposed WaterStation investments would not qualify for SBA 7(a) loans;

    d. failing to tell Plaintiffs about Foster's dealings with Wear and/or WaterStation;

    e. failing to tell Plaintiffs about potential conflicts of interest, including Foster's relationship and dealings with Wear and/or WaterStation;

    f. failing to confirm loan proceeds were actually used to purchase water vending machines;

    g. failing to verify or confirm the existence and/or locations of the collateralized vending machines;

    h. engaging in conduct that violated SBA regulations and guidelines; and

    i. engaging in conduct of self-dealing from which Celtic Bank and Foster derived an improper benefit.

140. Plaintiffs reasonably and justifiably relied on Celtic Bank to guide them through the loan process and to disclose any material information bearing on the transaction.

141.     As a direct and proximate result of the breaches of fiduciary duties committed by Celtic Bank, Plaintiffs have suffered damages and sustained and incurred substantial losses.

142.     Pursuant to 28 U.S.C. § 2201, Plaintiffs seek declaratory relief from the Court finding that the loan agreements, notes, personal guarantees, pledges of collateral, and other agreements and/or security instruments that Plaintiffs were fraudulently induced to sign are void and unenforceable against them, and that all obligations associated with such agreements or instruments are void and unenforceable based on the branches of fiduciary duty by the lender.

143.     Plaintiffs seek injunctive relief against Celtic Bank precluding Celtic Bank from enforcing the subject agreements against them.

**F.     COUNT VI: VIOLATION OF THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT OF 1970 ("RICO"), 18 U.S.C. § 1962(c) & (d)** (Against Celtic Bank and Celtic Investment)

144.     Plaintiffs reallege and incorporate all allegations of this Complaint.

145.     Celtic Bank and Celtic Investment are persons, as that term is defined in 18 U.S.C. § 1963(3).

146.     As alleged herein, the WaterStation Enterprise is an association-in-fact enterprise—within the meaning of 18 U.S.C. § 1963(4)—consisting of Wear, WST, WSM, WFS, Celtic Bank, UniBank, First Fed Bank, Foster and other individuals and institutions that were used to conduct the activities of the WaterStation Enterprise. The Enterprise's scheme's purpose is to steal money from franchisees through a complicated web of financial arrangements and practices and whose activities impact interstate commerce.

147.     The coordinated efforts of Defendants and other members of the Enterprise continued for over two years.

148.    Celtic Bank, through its employees and extensive experience as an SBA preferred lender, was aware that Plaintiffs could not qualify for an SBA loan, as demonstrated by, for example, Foster's history and dealings with Wear and WaterStation, including his ownership of a WaterStation passive franchise that he financed through SBA loans from another lender.

149.    Celtic Bank deceived Plaintiffs into obtaining these SBA loans by means of false or fraudulent pretenses through a pattern of racketeering activity.

150.    18 U.S.C. § 1963(1) defines "racketeering activity" to include "any act which is indictable under . . . title 18, United States Code . . . section 1341 (relating to mail fraud), [and] section 1343 (relating to wire fraud)[.]"

151.    Celtic Bank mailed and/or wired loan documents to Plaintiffs with knowledge Plaintiffs did not qualify for an SBA loan.

152.    Celtic Bank transmitted loan documents to Plaintiffs for electronic signature with knowledge Plaintiffs did not qualify for an SBA loan.

153.    Celtic Bank executed the wire transfers to WaterStation for the purchase of WaterStation franchises/machines with knowledge that Plaintiffs did not qualify for an SBA loan.

154.    Celtic Bank transmitted Plaintiffs' and its loan documentation to the SBA with knowledge that Plaintiffs did not qualify for an SBA loan.

155.    Celtic Bank transmitted and mailed loan documents detailed throughout this Complaint in interstate commerce for the purpose of obtaining money from Plaintiffs under false or fraudulent pretenses.

156.    Pursuant to 18 U.S.C. § 1963(5), a "pattern of racketeering activity" requires at least two acts of racketeering activity within 10 years. Considering the number of investors

involved, including Plaintiffs, Defendants executed at least dozens of such wire and/or mail communications within 10 years of each other.

157.    Foster, an Enterprise member, was an employee and agent of Celtic Bank acting within the scope of his employment and was associated with Celtic Bank and Celtic Investment.

158.    To the extent necessary, Celtic Bank and Celtic Investment benefited from the Enterprise's pattern of racketeering activity, by obtaining fees and interest payments from Plaintiffs, among other gains as alleged herein. As another example, Foster received a payout for his WaterStation investment(s).

159.    Celtic Bank and Celtic Investment conducted or participated, directly or indirectly, in the pattern of racketeering activity described herein and conducted by the association-in-fact described herein.

160.    Because Celtic Bank and Celtic Investment benefitted from the Enterprise's violation, and because their employees and agents engaged in the violations within the scope of their employment, Celtic Bank and Celtic Investment are liable under the doctrines of respondeat superior and/or agency, to the extent necessary.

161.    18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

162.    At all relevant times, Celtic Bank and Celtic Investment agreed to and did conspire to violate 18 U.S.C. § 1962(c), as alleged and incorporated herein, in violation of 18 U.S.C. § 1962(d). The object of the conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the enterprise described herein. Celtic Bank and Celtic Investment conspired and agreed to conduct and participate in conduct of the affairs of the enterprise described

previously through a pattern of racketeering activity (wire and mail fraud). Celtic Bank's and Celtic Investment's conduct constituted a conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

163.    As a direct and proximate result of Celtic Bank's and Celtic Investment's racketeering acts and violation of 18 U.S.C. § 1962(c) and (d), Plaintiffs were injured in their businesses and properties. Plaintiffs are entitled to recover treble damages and attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

164.    Pursuant to 28 U.S.C. § 2201, Plaintiffs seek declaratory relief from the Court finding that the loan agreements, notes, personal guarantees, pledges of collateral, and other agreements and/or security instruments that Plaintiffs were fraudulently induced to sign are void and unenforceable against them, and that all obligations associated with such agreements or instruments are void and unenforceable based on fraud of the lender.

165.    Plaintiffs seek injunctive relief against Celtic Bank precluding Celtic Bank from enforcing the subject agreements against them.

G.    **COUNT VII: VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT (15 U.S.C. § 78j(b)) AND RULE 10b-5 (17 C.F.R. § 240.10b-5)** (Brought Alternatively Against Celtic Bank and Celtic Investment)

166.    Plaintiffs reallege and incorporate all allegations of this Complaint.

167.    Plaintiffs plead this count in the alternative should the Court determine the RICO claims are not actionable.

168.    15 U.S.C. § 77b(a)(1) defines a security to include, among other things, a note, an investment contract, and any participation in a profit-sharing agreement.

169.    The *Howey* test for defining an investment contract includes: (1) an investment of money; (2) in a common enterprise; (3) with the expectation of profit; and (4) to be derived from the efforts of others. *See S.E.C. v. W.J. Howey*, 328 U.S. 293, 298 (1946).

170.    Each Plaintiff's investment(s) in the WaterStation franchise(s) satisfies the *Howey* test and/or 15 U.S.C. § 77b(a)(1), and therefore each investment transaction is a security.

171.    Celtic Bank and Celtic Investment intentionally, knowingly, or recklessly, directly or indirectly, by the use of means or instrumentalities of interstate commerce, including mails and wires, used or employed, in connection with the sale or purchase of a security, a manipulative or deceptive device or contrivance to defraud Plaintiffs in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a)–(c) by: (a) employing a device, scheme, and/or artifice to defraud Plaintiffs; (b) making an untrue statement of a material fact and/or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in fraudulent scheme to fund loans for the purchase of securities for which Celtic Bank knew Plaintiffs did not qualify, but failed to disclose as much to Plaintiffs, as further described below.

172.    Celtic Bank used or employed a plan, scheme, transaction, and course of business to operate a fraudulent lending scheme. The scheme targeted WaterStation investors like Plaintiffs. The scheme went beyond and, in fact, in furtherance of misrepresentations and omissions (both of which have also been described herein). The scheme was designed to deceive innocent investors into borrowing SBA loans to purchase WaterStation franchises, even though their franchise investments did not qualify for SBA loans, and to obfuscate WaterStation's fraudulent operation. The scheme depended on a fiction that acted as a fraud or deceit on Plaintiffs—that Plaintiffs'

franchises were eligible for SBA loans. In reality, Celtic Bank was aware Plaintiffs' investments did not satisfy SBA's eligibility requirements, especially considering Celtic Bank's head of SBA lending department was a WaterStation franchisee. In communications with Plaintiffs related to the sale or purchase of the WaterStation franchise investments, Celtic Bank misrepresented and/or omitted information related to the securities, including, but not limited to, the fact that Plaintiffs were not qualified for an SBA 7(a) loan, Celtic Bank employees engaged in conduct that posed a potential conflict of interest or constituted self-dealing, Celtic Bank employees suspected fraud, Celtic Bank employee(s) promoted the WaterStation franchise as a great investment opportunity, and Celtic Bank employee(s) withheld information about or misrepresented the risks associated with WaterStation investments.

173.    Celtic Bank had a duty to confirm the veracity of representations and disclose material omissions related to the securities in order to make statements made, in light of the circumstances under which they were made, not misleading.

174.    Celtic Bank was aware of the misrepresentations and/or omissions made to Plaintiffs, and despite that, approved and issued SBA loans to Plaintiffs.

175.    Plaintiffs rely on the presumption of reliance based on Celtic Bank's material omissions. Regardless, alternatively and in addition to the established presumption, Plaintiffs reasonably and justifiably relied on the misrepresentations and omissions, and conduct of Celtic Bank in investing in WaterStation and executing the loan transactions.

176.    Because Celtic Bank's employees made material misrepresentations and/or omissions to Plaintiffs in the course and scope of their employment and/or with the acquiescence

48

of Celtic Bank, and because Celtic Bank derived profit from the transactions, Celtic Bank is liable under the doctrine of respondeat superior, to the extent necessary.

177.    Celtic Bank directly controls its employees who provided material misrepresentations and/or omissions to Plaintiffs. Because Celtic Bank is a wholly owned subsidiary of Celtic Investment, Celtic Investment directly controls Celtic Bank. Thus, Celtic Investment directly or indirectly controls the employees who provided material misrepresentations and/or omissions to Plaintiffs.

178.    Because of the misrepresentations and/or omissions made to Plaintiffs in connection with the sale of the securities, as detailed and alleged throughout this Complaint, Plaintiffs suffered damages in an amount to be determined at trial.

179.    Pursuant to 28 U.S.C. § 2201, Plaintiffs seek declaratory relief from the Court finding that the loan agreements, notes, personal guarantees, pledges of collateral, and other agreements and/or security instruments that Plaintiffs were fraudulently induced to sign are void and unenforceable against them, and that all obligations associated with such agreements or instruments are void and unenforceable based on fraud of the lender.

180.    Plaintiffs seek injunctive relief against Celtic Bank precluding Celtic Bank from enforcing the subject agreements against them.

**H.    COUNT VIII: VIOLATION AND AIDING AND ABETTING VIOLATION OF UTAH UNIFORM SECURITIES ACT (Utah Code Ann. § 61-1-1, *et seq.*)**
(Against Celtic Bank and Celtic Investment)

181.    Plaintiffs reallege and incorporate all allegations of this Complaint.

182.    Each Plaintiff's investment(s) in the WaterStation franchise(s) constitutes a "security" for purposes of Utah state securities law. *See, e.g.*, Utah Code Ann. § 61-1-13(1)(s) & (ee)(i)(A), (G), (K).

183.    In connection with the sale or purchase of a security, Celtic Bank and Celtic Investment directly or indirectly: (a) employed a device, scheme, and/or artifice to defraud Plaintiffs; (b)  made an untrue statement of material facts and/or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c)  engaged in an act, practice, and course of business that operated as a fraud and deceit upon Plaintiffs.

184.    Celtic Bank used or employed a plan, scheme, transaction, and course of business to operate a fraudulent lending scheme. The scheme targeted WaterStation investors like Plaintiffs. The scheme went beyond and, in fact, in furtherance of misrepresentations and omissions (both of which have also been described herein). The scheme was designed to deceive innocent investors into borrowing SBA loans to purchase WaterStation franchises, even though their franchise investments did not qualify for SBA loans, and to obfuscate WaterStation's fraudulent operation. The scheme depended on a fiction that acted as a fraud or deceit on Plaintiffs—that Plaintiffs' franchises were eligible for SBA loans. In reality, Celtic Bank was aware Plaintiffs' investments did not satisfy SBA's eligibility requirements, especially considering Celtic Bank's head of SBA lending department was a WaterStation franchisee. In communications with Plaintiffs related to the sale or purchase of the WaterStation franchise investments, Celtic Bank misrepresented and/or omitted information related to the securities, including, but not limited to, the fact that Plaintiffs were not qualified for an SBA 7(a) loan, Celtic Bank employees engaged in conduct that posed a

potential conflict of interest or constituted self-dealing, Celtic Bank employees suspected fraud, Celtic Bank employee(s) promoted the WaterStation franchise as a great investment opportunity, and Celtic Bank employee(s) withheld information about or misrepresented the risks associated with WaterStation investments.

185.    Celtic Bank had a duty to confirm the veracity of representations and disclose material omissions related to the securities in order to make statements made, in light of the circumstances under which they were made, not misleading.

186.    Celtic Bank was aware of the misrepresentations and/or omissions made to Plaintiffs, and despite that, approved and issued SBA loans to Plaintiffs.

187.    The aforementioned actions constituted unlawful conduct in connection with the sale or purchase of a security under Utah Code Ann. § 61-1-1(1)–(3). The conduct of Celtic Bank and Celtic Investment was reckless and/or intentional.

188.    Plaintiffs rely on the presumption of reliance based on Celtic Bank's material omissions. Regardless, alternatively and in addition to the established presumption, Plaintiffs reasonably and justifiably relied on the misrepresentations, omissions, and conduct of Celtic Bank employees in investing in WaterStation and executing the loan transactions.

189.    Because Celtic Bank's employees made these material misrepresentations and/or omissions to Plaintiffs in the course and scope of their employment and/or with the acquiescence of Celtic Bank, and because Celtic Bank derived profit from the transactions, Celtic Bank is liable under the doctrine of respondeat superior, to the extent necessary.

190.    Celtic Bank directly controls its employees who provided material misrepresentations and/or omissions to Plaintiffs. Because Celtic Bank is a wholly owned

subsidiary of Celtic Investment, Celtic Investment directly controls Celtic Bank. Thus, Celtic Investment directly or indirectly controls the employees who provided material misrepresentations and/or omissions to Plaintiffs.

191.    Celtic Bank and Celtic Investment knowingly aided and abetted and substantially assisted each other and others in defrauding Plaintiffs and concealing material facts set forth herein in violation of Utah Code Ann. § 61-1-1(1)–(3).

192.    Because of Celtic Bank and Celtic Investment's unlawful conduct, Plaintiffs suffered damages in an amount to be determined at trial. Plaintiffs are entitled to all remedies under Utah Code Ann. § 61-1-1(22).

193.    Pursuant to 28 U.S.C. § 2201, Plaintiffs seek declaratory relief from the Court finding that the loan agreements, notes, personal guarantees, pledges of collateral, and other agreements and/or security instruments that Plaintiffs were fraudulently induced to sign are void and unenforceable against them, and that all obligations associated with such agreements or instruments are void and unenforceable based on fraud of the lender.

194.    Plaintiffs seek injunctive relief against Celtic Bank precluding Celtic Bank from enforcing the subject agreements against them.

**I.      COUNT IX: VIOLATION OF UTAH CONSUMER SALES PRACTICES ACT (Utah Code Ann. § 13-11-1 et seq.)** (Against Celtic Bank)

195.    Plaintiffs reallege and incorporate all allegations of this Complaint.

196.    Celtic Bank is a "supplier" within the meaning of Utah Code Ann. § 13-11-3(6).

197.    Each Borrower's SBA loan was a consumer transaction within the meaning of Utah Code Ann. § 13-11-3(2).

198.    In connection with a consumer transaction, Celtic Bank violated the Utah Consumer Sales Practices Act by engaging in deceptive and/or unconscionable acts or practices as complained of herein, when, *inter alia*:

a.  Celtic Bank failed to disclose Foster's ties and dealings with WaterStation and/or Wear.

b.  Celtic Bank failed to disclose Foster would be paid more than other franchisees.

c.  Celtic Bank failed to disclose self-dealings and/or conflicts of interest posed by Foster's history and transactions with Wear and/or WaterStation.

d.  Celtic Bank failed to disclose it was enabling WaterStation and/or Wear to pay out Foster's franchise interest in WaterStation.

e.  Celtic Bank failed to disclose Foster's awareness of WaterStation's financial condition or its failure to perform or timely repay Foster.

f.  Celtic Bank failed to disclose that Foster would have competing claims with Borrowers should WaterStation become insolvent.

g.  Celtic Bank failed to disclose that they knew or should have known WaterStation and/or Wear could not repay.

h.  Celtic Bank failed to disclose they were financing overlapping machines or that Wear and/or WaterStation was selling or assigning the same machines to different investors.

i.  Celtic Bank failed to disclose it had not verified the existence (and/or locations) of the machines.

j.   Celtic Bank failed to disclose whether any Wear and/or WaterStation activities triggered fraud alerts or compliance concerns.

k.   Celtic Bank made false representations about the nature of the investments and whether their loans were SBA compliant.

l.   Celtic Bank made false representations that the loan proceeds would be used to purchase the WaterStation machines—machines that turned out to be nonexistent or duplicative.

m.   Celtic Bank made false representations that Plaintiffs' investments and/or business entities were eligible or otherwise qualified for SBA's 7(a) loans.

n.   Celtic Bank made false representations that Plaintiffs' investments and/or business entities were approved for SBA's 7(a) loans.

o.   Celtic Bank deceived Plaintiffs into obtaining SBA loans and, in fact, issued those loans with knowledge that Plaintiffs did not qualify for SBA loans.

p.   Celtic Bank failed to identify and disclose all facts relating to Plaintiffs' WaterStation investments and the loans.

q.   Celtic Bank continues to seek to collect and enforce the fraudulent loans.

r.   Celtic Bank accepted Borrowers' payments, interest, and other fees and have failed to return these funds.

s.   Celtic Bank falsely claimed there were mitigation steps to protect collateralized properties.

t.   Celtic Bank falsely represented that it would file UCC financing statements for the collateralized vending machines.

199.    Celtic Bank's unconscionable or deceptive acts or practices are ongoing and are a proximate cause of Plaintiffs' injuries. Plaintiffs are entitled to legal and equitable remedies without limitation to damages in an amount to be determined at trial, plus punitive damages and attorneys' fees and costs.

200.    Pursuant to 28 U.S.C. § 2201, Plaintiffs seek declaratory relief from the Court finding that the loan agreements, notes, personal guarantees, pledges of collateral, and other agreements and/or security instruments that Plaintiffs were fraudulently induced to sign are void and unenforceable against them, and that all obligations associated with such agreements or instruments are void and unenforceable based on fraud of the lender.

201.    Plaintiffs seek injunctive relief against Celtic Bank precluding Celtic Bank from enforcing the subject agreements against them.

## VII.    JURY DEMAND

202.    Plaintiffs demand a trial by jury of all issues and claims so triable herein.

## VIII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court render judgment against Defendants and award the following relief:

a.    Any and all legal or equitable remedies available under applicable law;

b.    Damages (including compensatory, consequential, and incidental damages) and equitable relief available under applicable law in an amount and of a nature to be determined at trial;

c.    Damages for emotional distress, mental anguish, and any other general damages;

d.    Treble damages as authorized by 18 U.S.C. § 1964(c);

e.     Prejudgment and postjudgment interest at the highest rates allowed under applicable law;

f.     Declaratory and temporary and permanent injunctive relief;

g.     Attorneys' fees and costs incurred in this action;

h.     Punitive damages; and

i.     Such other and further relief as the Court deems just, equitable, or proper.

DATED this 27th day of August, 2025.

McNeill | Von Maack


/s/ Christopher M. Von Maack
Christopher M. Von Maack
Eric K. Schnibbe
Craig M. Hansen
*Attorneys for Plaintiffs*


Munck Wilson Mandala, LLP

Robert E. Linkin (*pro hac vice forthcoming*)
Tri. T. Truong(*pro hac vice forthcoming*)
*Attorneys for Plaintiffs*